# Horbach *against* Gray.

A contract based on a supposed state of things which had no existence in fact, will be relieved against on the ground of mistake.

A parol contract for the purchase and sale of land will not merge in a collateral covenant between the parties respecting the title, so as that an action may not be supported upon it to recover the purchase-money.

ERROR to the district court of *Allegheny* county.

James Gray against Adam Horbach. This was an action of *assumpsit* brought to recover the purchase-money of a tract of land sold by the plaintiff to the defendant and William Stewart, for the

[Horbach v. Gray.]

sum of 12,000 dollars—each to pay one-half. A deed with covenant of general warranty was executed and delivered. Stewart paid his half of the purchase-money, and the plaintiff claimed to recover from the defendant a balance of 2500 dollars of his half.

William Stewart, sworn.—I am one of the parties in this deed. Our original contract to purchase from Gray was not in writing. We were equal partners in the purchase, but each was to pay his own share of the purchase-money. At the time the deed was made, 3000 dollars were paid by each of us, either in cash or by negotiable note; and besides this, we assumed a mortgage of 1000 dollars, which was a lien on the land. For the balance of my share, to wit, 2500 dollars, I gave my note, without interest, at 18 months. I gave my note some time after we got the land, but it was dated back to that time. About the time, or previous to the time of the deed, there was some difficulty about an agreement once made with Bausman, in his lifetime, for an exchange of this land for other land. Gray had promised to have this agreement cancelled. We withheld our notes for the remaining 2500 dollars, as security against this possible difficulty in the title. Gray said it was nothing but his proposition made to Bausman, and acceded to by Bausman; but that, after his death, his executors had requested him (Gray) to give up the agreement and release the estate; that he had done so; that Mr Watts, the executor, was agreed, but did not give up the paper, or could not find it—he said he believed Watts had lost it. I gave my note and paid my money, without any further trouble about this agreement. I became satisfied it was a bare possibility, and Gray was good, and I had a general warranty. Gray was in possession a year after our purchase, by our consent. Horbach is himself on the land now. Horbach made the contract himself with Mr Gray. I went in with Horbach, and took half. I have sold my share at an advance. I did not buy with a view of improving or holding it.

Gray was anxious to sell—wanted money; he went with me to Greensburgh, to see Horbach.

I think Horbach's objection to close the bargain was about this supposed agreement with Bausman. It was understood, when we made the contract, that Gray was to have this agreement with Bausman cancelled. Gray had purchased land in Illinois, and was anxious to make money. Horbach did not appear very anxious to buy. Gray represented that Watts had the paper, but he had stated it was lost; or, to speak more correctly, the words he used were, it was mislaid, or Watts could not find it.

R. A. Bausman, Esq., sworn:—Dr Bausman was a brother of mine. I saw this agreement, made with Gray, among his papers, shortly after his death. It passed into the hands of Mr Watts, one of the executors. Dr Bausman owned 2000 acres of land in Venango county. I do not recollect exactly the nature of the contract—it was to exchange these 2000 acres of land for Gray's farm

[Horbach v. Gray.]

of ———. There was a note at the bottom of it, signed by my brother, stating that if Gray was pleased with the Venango lands when he saw them, he should be bound by that contract; if not, he was not bound by it. Before Gray had returned from visiting these lands, my brother died. On behalf of the estate, I called on Mr Gray after his return. I had consulted with the executors and my sister. It was agreed that it would be injurious to the estate to go on with the contract, as it required, money to be paid by the estate. I called on Gray, on behalf of my brother's estate, and requested him, as it was in his power to ratify the agreement or not, after seeing the lands, that he would not hold the estate to the bargain. He agreed he would not. We have since that time put out the land in Venango county on improving leases. The contract has been considered by all parties as cancelled long ago. My brother died the 28th of March 1834. I do not know what has become of the paper; I have searched through all the papers of the estate since the last trial. The papers of the estate are in the possession of my nephew. Since Mr Watts went to Philadelphia, I have searched the papers twice, at the instance of Mr Gray. Feel satisfied that it is not to be found. No act was ever done in pursuance of this contract, except Gray's going to see the lands. No money was paid by the estate on it. Mr Gray never showed any disposition to hold us to the contract, and the matter being entirely in his power, we concluded the thing was settled and ended. Judge Dallas was one of the executors. I do not mean to say he approved of cancelling it. I consulted him; he advised us to get clear of it, if we could. Mr Watts took the execution of the will on himself. Mr Dallas did nothing in it. Think the agreement was not under seal, but think it was signed by the parties. Not certain about the seal. I recollect of thinking it a strange agreement, as it left one party bound, and the other not. The note at the bottom, leaving it to Gray's option to be bound or not, as he pleased, after seeing the land, was signed by my brother alone. Cannot say certainly whether there were any witnesses to the agreement, but I do not think there were. Think the body of the agreement was in Gray's hand, and the note at the bottom was in my brother's own handwriting. I cannot give the language of the agreement. It was for the exchange of the property in Venango for Gray's farm here. There was some money to be paid by Bausman, but do not recollect how much; my impression, 2000 dollars. It was soon after my brother's death I had the conversation with Gray about agreeing to annul this contract. I cannot state the date of the agreement. It was shortly before my brother's death, and very shortly before it. The Venango lands are worth 25 dollars an acre now.

Allen Cramer, sworn:—I was guardian for two of Dr Bausman's children. Shortly after Dr Bausman's death, called at the house; had a conversation with his widow—she expressed considerable fears in relation to an instrument of writing entered into by Dr

[Horbach v. Gray.]

Bausman, in his lifetime, with Mr Gray, relative to exchange of property with him. Expressed her fear that Gray would be disposed to hold them to it, and they would have to sell some of the real estate to raise the money, as the personal estate would not more than pay the other debts. She requested me to see Mr Gray, and to have an interview with him in relation to this matter. I called upon Mr Gray and asked him if he intended to hold them to a compliance with the article, as I wished to know from him positively what course he intended to pursue, as the 2000 acres in Venango had been devised to the children for whom I was guardian. He told me to tell Mrs Bausman to consider the whole matter as cancelled—that he was the last man to do anything to the disadvantage of a widow and orphans. He said if it was necessary, he would give an instrument of writing to that effect. No writing was given. I went to rent the lands, and gave improving leases. I never saw the agreement. Dr B. left six children—all minors but one. The youngest is six years old now.

Pressly Bausman sworn.—Am a son of deceased Dr. Bausman, and am an executor. I do not recollect to have ever seen this paper. All I ever did see among my father's papers was a memorandum of this kind, that "Mr Gray has this day left for Venango county to look at my Hickorytown lands, and if he is pleased with the lands, there is to be an exchange with him for his lands near Wilkinsburgh." It was a memorandum in his handwriting; do not recollect whether signed or not—I have never seen it since. After Mr Watts left this for Philadelphia, the papers of my father's estate were left with me. I heard Mr Gray wished this agreement searched for. I searched the papers three times for it—could not find it. I have never seen the agreement; nothing was ever done in pursuance of it. All the executors are alive—there are Mr Watts, Mr Dallas, my mother, and myself. All reside here, except Mr Watts; he is now in Philadelphia. Mr Watts was the acting executor, and had the papers. I have them now; I got part of them from Mr Bradford, who had been counsel for the estate—part from Mr Knox, who remained in Mr Watts's office after he went away. Mr Veech had been counsel in some cases; I wrote to him for papers—he said all he had were in Mr Findlay's hands.

Hon. T. B. Dallas sworn.—I was named in Dr B.'s will as among his executors, with Mrs. B. and Pressly B. I declined, from the outset of the matter, taking any active part. All the papers were delivered to Mr Watts, and some to Pressly B. I saw the agreement at one time—perhaps more than once. I think in Mr Watts's office I saw it. Mr Gray frequently spoke to me to have the agreement cancelled. I uniformly declined having any thing to do with it, as I never had interfered in the management of the estate—that Mr Watts had the management of it. Think Mr Watts spoke to me once on the subject about it. I think I told him

I could have nothing to do with it, as I was not prepared to say what the consequences might be when the heirs came of age.

As I had not interfered in the management of the estate, I did not think I was called upon to take any responsibility about it. I told Mr Gray he might apply to court, and have the agreement carried into effect. He said he wanted it cancelled, and all the family, so far as I knew, agreed in wishing it cancelled. I don't know whether it was destroyed or cancelled. It was the wish of all interested that it should be cancelled, but I don't know that it ever was done. I gave neither assent nor dissent about it.

I recollect nothing further of the contents of it, except it was for exchanging of Hickorytown property for Gray's farm here. Do not recollect what boot between them. I believe letters testamentary were issued to all of us.

The defendant then gave in evidence the *following* agreement between the parties.

" Whereas, James Gray has sold and conveyed to Abraham Horbach and Wm Stewart, a tract of land in Wilkins township, on which said Gray now lives; and whereas, there is a certain memorandum or agreement between said Gray and the late Dr. Bausman, for an exchange of the said tract of land for certain other lands in Venango county, which said agreement has never been perfected. Now, this memorandum witnesseth, that said Gray binds himself, his heirs, executors, and administrators, to obtain, deliver up and cancel said agreement, with Dr. Bausman, as soon as practicable. And the said Abraham Horbach binds himself, his heirs, executors, administrators, and assigns, upon the performance of this condition by said Gray, to make and deliver to him his certain promissory note for 2500 dollars, dated May 13, 1836, payable 18 months after date; said agreement to be cancelled by the executors and guardians of said Bausman's will and children, and by Gray, or by order of the court.

" Witness, the hands and seals of the said parties, the 28th of May 1836.

> "James Gray, [l. s.]
> " A. Horbach, [l. s.]"

Samuel Gormly.—Above article shown. "This was written by me, and witnessed by me. I do not recollect when the deed was delivered. It was about the time when this memorandum was made. Mr Horbach objected to taking the deed without this memorandum; he apprehended difficulty about the agreement with Bausman, and required a stipulation that Gray should have it cancelled. Gray stated it could be done by an order of the court. This paper was made about the time the deed was delivered."

*Grier*, president, in answer to certain points propounded by the defendant, instructed the jury that, under the facts given in evidence, there was nothing in the agreement between the parties, of the 28th of May 1836, which would prevent the plaintiff from

[Horbach v. Gray.]

recovering in this action of assumpsit upon the original contract of sale.

*Findlay*, for plaintiff in error.
*Williams*, for defendant in error.

Per Curiam.—Had the vendee unconditionally accepted the conveyance containing, as it did, a covenant of general warranty, he would have elected to rely on it exclusively, and could not have used this known and contingent defect, whether real or supposed, as a pretext to withhold the purchase-money. Did the special covenant which he exacted, give him a particular right to do so? The vendor, Gray, bound himself " to obtain, deliver up, or cancel, said agreement with Doctor Bausman, as soon as practicable;" and the vendee bound himself, " upon the performance of this condition by the said Gray, to make and deliver him his certain promissory note for 2500 dollars, dated May 15, 1836, and payable eighteen months after date;" from which it is attempted to be inferred, that the parol contract of sale was merged in the covenant; that is to say, that the vendor consented, in the event that the paper should turn out to have been *previously* destroyed or lost, to forfeit his land and the price of it together. If that pretension be disclaimed, then it must be conceded that the construction insisted on, is an unsound one; for it would produce just that effect. On the covenant he could never have an action at all, for the performance of his own covenant, since found to be impracticable, would be a condition precedent to it; and thus his inability to produce a defeasible agreement, subsequently annulled and reduced to the value of waste paper, would have the effect of depriving him of his estate. Even were such a consequence inevitable at law, equity would not suffer it to be enforced; for there is a numerous class of cases in which contracts, based on a supposed state of things which had no existence in fact, have been relieved against, on the ground of mistake. But there was no such merger. The covenant was a special one operating, not on the contract of purchase, but on a thing collateral to it—the terms of the security to be given for the purchase-money— and if the vendor think proper to waive the benefit of the security, why may he not do so without being held to performance of his covenant, as a condition precedent to an action not founded on the instrument? If the vendee think himself prejudiced by want of such performance, let *him* bring an action on it; but let him not detain the whole purchase-money for what would be a ground to recover, at most, but nominal damages. The judge, therefore, was right in directing that the plaintiff might recover on the evidence, and under the present form of action.

Judgment affirmed.